# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

HEATH NELSON,

    Petitioner,                               CASE NO. 2:06-15157

v.                                          HONORABLE NANCY G. EDMUNDS
                                             UNITED STATES DISTRICT JUDGE

MILLICENT WARREN,

    Respondent,
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Heath Nelson, ("Petitioner"), confined at the Thumb Correctional Facility in Lapeer, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, petitioner challenges his conviction for second-degree murder, M.C.L.A. 750.317; kidnapping, M.C.L.A. 750.349; and being a fourth felony habitual offender, M.C.L.A. 769.12. For the reasons stated below, the application for writ of habeas corpus is **DENIED.**

### I. Background

Petitioner was convicted of the above charges following a jury trial in the Kent County Circuit Court, in which he was tried jointly with his co-defendant Mark Hardiman, but by separate juries. Petitioner has provided a detailed statement of facts in his petition for writ of habeas corpus. [1] Respondent does not dispute these facts in her

---

[1] *See* Memorandum of Law in Support of Petition for Writ of Habeas Corpus, pp. 2-21 [This Court's Dkt Entry # 1].

answer. The Court will therefore accept the factual allegations contained within the habeas petition insofar as they are consistent with the record, because the respondent has not disputed them. *See Dickens v. Jones,* 203 F. Supp. 2d 354, 360 (E.D. Mich. 2002). Because the facts of this case have been repeated numerous times, they need not be repeated here in their entirety. Therefore, only a brief overview of the facts is required. *See Nevers v. Killinger,* 990 F. Supp. 844, 847 (E.D. Mich. 1997).

The prosecutor's theory in this case was that petitioner and Hardiman kidnapped and murdered the victim, to avenge the burglary of Hardiman's girlfriend's apartment. The police recovered the victim's blood and DNA from Hardiman's car.

Toni Rosemond testified that her townhouse had been broken into on December 19, 1998. Rosemond believed that the victim and his sister, Lashonda Taylor, a former girlfriend of Hardiman's, had been involved in the break-in. Rosemond called Hardiman, who was in Chicago at the time, and spoke with him and petitioner about the break-in. On December 20, 1998, Hardiman, George Weaver, Elijah Mayfield, and petitioner returned to Rosemond's apartment. Lashonda Taylor's and the victim's names were mentioned as being involved in the break-in. Rosemond's apartment was broken into a second time the next night.

Annette Nichols lived in the downstairs apartment below petitioner's apartment on Thomas Street. Around Christmas, petitioner had offered Nichols money to take him to a rap concert in Chicago. After Nichols had returned from Chicago, she had heard a disturbance upstairs from petitioner's apartment that sounded like "somebody was

wrestling or seemed like a fight was going on". Nichols testified that she heard loud voices and rumbling, the sound of glass breaking, and then it got quiet. About two days later, Nichols asked petitioner what happened. Petitioner replied that some guys had been arguing over a video game, they got out of control, and the window had been broken. Nichols never heard any gunshots.

George Weaver testified against petitioner and Hardiman, in exchange for a plea bargain to reduced charges in an unrelated criminal case. Weaver testified to helping sell marijuana out of the petitioner's apartment on Thomas Street, although it was basically Hardiman's and Mayfield's operation.

Weaver attended a rap concert in Chicago with petitioner in December, 1998. While in Chicago, Weaver met Hardiman and Mayfield at a motel. Hardiman got a page from his girlfriend, and, after speaking with her, stated that his house had broken into and $10,000.00 was missing. Hardiman became angry and stated that he was going to kill the victim because the victim had called Hardiman and knew he was out of town. The other men discussed torturing the victim to get the money back, which calmed Hardiman down.

The following day, Weaver went to the petitioner's apartment on Thomas Street. Petitioner was there with Mayfield, Hardiman, and the victim. Elijah Allen and Ernesto McKinney were also present.

Weaver testified that Hardiman came running out of the kitchen with a bat and hit the victim over the head, breaking the bat and stunning the victim. Petitioner grabbed the

3

victim in a headlock and the two stumbled toward a window, which broke. Mayfield wrestled the victim into a chair. Hardiman put an automatic gun into the victim's mouth and told him to get the money, but the victim said he did not know what Hardiman was talking about. Hardiman gave some car keys to petitioner and told him to pull the car into the back yard.

Petitioner came back inside afterwards. Weaver testified that "they end up taking [the victim] through the hallway, out the kitchen way, out the back door, down the stairs, and putting him inside the trunk". Weaver observed Hardiman closing the trunk. Hardiman came back inside the house and said "anybody want out of this leave now."

Petitioner and Elijah Allen left with Hardiman. Weaver stayed at the Thomas Street apartment. About an hour later, Hardiman returned to the apartment. Hardiman and Mayfield went into the kitchen for a few minutes. When they returned, Weaver testified that Mayfield looked stunned. Weaver heard Hardiman inform Mayfield that "they killed Larry."

Weaver met petitioner later at Mayfield's house, at which time, petitioner told Weaver that he shot the victim in the chest and Hardiman had shot him in the head. Petitioner told Weaver that Hardiman had given the gun to Allen, but that he had refused to shoot the victim.

Elijah Mayfield testified that petitioner admitted shooting the victim, but claimed that this was an accident. When Mayfield asked petitioner about the second shot, petitioner "just put his head down" and didn't say anything.

Ernesto McKinney testified to going with Elijah Allen to the Thomas Street house in December, 1998. When McKinney arrived, he saw Weaver, the victim, Hardiman, and Mayfield. Someone hit the victim in the face and then a window got broken. McKinney testified that he "probably" saw a gun while the victim was being hit. Although he initially testified that he did not recall who hit the victim, on redirect examination, McKinney admitted telling the police that petitioner and Hardiman had assaulted the victim.

McKinney testified that petitioner, Hardiman, and Allen left the apartment with the victim to get the items that had been stolen in the burglaries. Petitioner, Hardiman, and Allen returned. McKinney testified that he never saw the victim alive again. When Allen came back, he looked "different, like something happen[ed]."

Elijah Allen testified that McKinney had asked him to go with him to Thomas Street, because Hardiman had phoned him and indicated that "somebody supposed to break in the crib and robbed him of stuff." When they arrived at the apartment, petitioner, Weaver, Mayfield, Hardiman, and the victim were there. Allen heard a "boom" and saw Hardiman swing a bat at the victim. The victim tried to jump out a window. Hardiman pulled the victim back and sat him in a chair and asked where his property was. The victim denied taking anything from Hardiman.

Petitioner took the victim's arm and walked him down the back stairs. Allen was asked to accompany petitioner and Hardiman to the victim's mother's house. By the time that Allen got outside, the victim was in the trunk of the car.

Hardiman drove to the country.  Petitioner and Hardiman discussed picking a spot to stop at.  Hardiman finally turned off into a driveway.  Petitioner got the victim out of the trunk.  While Hardiman was urinating, the victim attempted to escape, but petitioner grabbed him.

Hardiman walked to where petitioner was at, and Allen heard "pow-pow", i.e. two gunshots, but did not see who fired the shots.  When Allen looked around the corner, Hardiman had a small black gun in his hand, which he was trying to get unjammed.

Allen testified that the victim was lying on the ground, shaking, holding his stomach, and saying "don't, don't kill me".  Hardiman walked over to the victim and shot him point-blank in the forehead.  Hardiman then passed the gun to Allen and said "we in this together, why don't you shoot him", but Allen refused.

Sgt. Douglas Sinnema testified that petitioner voluntarily came in for an interview on December 24, 1998, before the police found the victim's body.  Petitioner told Sgt. Sinnema that he had not seen the victim for at least a week and a half.

In a second statement to the police, petitioner told Sergeant Robert Schumann that Hardiman had arranged for the victim to show up at the Thomas Street apartment on December 21, 1998, but that the victim never showed up.

Following his arrest, petitioner gave a third statement to the police, in which he admitted that the victim showed up at the Thomas Street apartment on December 21, 1998, but he denied killing him.

Petitioner's conviction was affirmed on *appeal. People v. Nelson,* No. 232356

6

(Mich.Ct.App. April 17, 2003); *lv. den.* 469 Mich. 950 (2003). Petitioner then filed a post-conviction motion for relief from judgment, which was denied. *People v. Nelson,* No. 00-1140-FC (Kent County Circuit Court, April 25, 2005). The Michigan appellate courts denied petitioner leave to appeal. *People v. Nelson,* No. 264459 (Mich.Ct.App. February 3, 2006); *lv. den.* 476 Mich. 864 (2006).

Petitioner seeks habeas relief on the following grounds:

I. During examination of a key witness the prosecution suggested that he had special knowledge that the witness' testimony was truthful and defense counsel failed to object to this improper innuendo.

II. During trial the prosecutor solicited testimony which amounted to an argument that petitioner tacitly admitted guilt when he hung his head in response to the witness asking petitioner why he shot the victim a second time.

III. During trial defense counsel for petitioner's co-defendant impeached two key witnesses with evidence that they had been convicted previously for filing false police reports. This impeachment occurred outside the presence of the Petitioner's jury. Counsel for petitioner tried to paint the two witnesses as liars, yet he inexplicably failed to impeach the witnesses in the presence of Petitioner Nelson's jury.

IV. Petitioner was denied the right to draw a jury from a fair cross section of the community where it has been revealed that the Kent County Jury System has excluded black[s] from jury venires for at least ten years.

## II. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

    (1)    resulted in a decision that was contrary to, or

> involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

### III.  Discussion

**A.  Claims # 1, 2, and 3.  The ineffective assistance of counsel claims.**

The Court will consolidate petitioner's three ineffective assistance of counsel claims for judicial clarity.

To prevail on his ineffective assistance of counsel claims, petitioner must show that the state court's conclusion regarding these claims was contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984). *See Cathron v. Jones,* 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002).  *Strickland* established a

two-prong test for claims of ineffective assistance of counsel: the petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687.     Petitioner first claims that counsel was ineffective for failing to object when the prosecutor improperly vouched for witness George Weaver's credibility, by eliciting testimony that Weaver had entered into a plea agreement to testify truthfully.

The questions and comments in this case did not amount to improper vouching, because they merely encompassed the terms of Weaver's plea agreement with the state. *See United States v. Trujillo,* 376 F. 3d 593, 608-09 (6th Cir. 2004); *See also United States v. Owens,* 426 F. 3d 800, 806-07 (6th Cir. 2005). To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different. *See Hinkle v. Randle,* 271 F. 3d 239, 245 (6th Cir. 2001). Because the prosecutor's comments did not amount to improper vouching, counsel's failure to object to the prosecutor's comments and questions was not ineffective assistance of counsel. *See Meade v. Lavigne,* 265 F. Supp. 2d 849, 866 (E.D. Mich. 2003).

In his second claim, petitioner contends that counsel was ineffective for failing to object to testimony from Mayfield that petitioner had hung his head when asked about the crime, claiming that this testimony was improper because the prosecutor used it as a

tacit admission of petitioner's guilt.

Petitioner does not allege that the prosecutor violated his federal constitutional right to remain silent. Instead, petitioner claims that the prosecutor violated Michigan law, which prohibits the use of tacit admissions, or evidence of a defendant's failure to respond to an accusation, as substantive evidence of the defendant's guilt. *See People v. Hackett*, 460 Mich. 202, 212; 596 N.W.2d 107 (1999); *People v. Bigge*, 288 Mich. 417; 285 N.W. 5 (1939). The application of the *Bigge* rule, however, is "limited to tacit admissions, in the form of a defendant's failure to deny an accusation." *Hackett,* 460 Mich. at 214-15. A defendant's silence that does not occur in the face of an accusation does not implicate the *Bigge* rule. *Id.* at 215.

The Michigan Court of Appeals rejected petitioner's claim, finding that petitioner's act of hanging his head did not occur in the face of an accusation, because Mayfield did not accuse petitioner of anything but simply made an inquiry about a second shot. Therefore, petitioner's silence could not be construed as tacitly adopting any statement or accusation. *Nelson,* Slip. Op. at * 6. The Michigan Court of Appeals further concluded that evidence of petitioner's conduct when he was asked about a second shot was relevant to impeach petitioner's claim to Mayfield that the shooting was accidental. *Id.* Because the prosecutor did not improperly use petitioner's silence in the face of an accusation as substantive evidence against him, petitioner's counsel had no basis for objecting to the testimony. *Id.*

In rejecting petitioner's ineffective assistance of counsel claim, the Michigan

10

Court of Appeals found that Mayfield's challenged testimony was admissible under Michigan law. Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005)(*quoting Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Because the Michigan Court of Appeals determined that Mayfield's testimony about petitioner hanging his head was admissible under Michigan law, this Court must defer to that determination in resolving petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 Fed. Appx. 431, 437-38 (6th Cir. 2008); *Adams v. Smith*, 280 F.Supp.2d 704, 721 (E.D. Mich. 2003). In this case, trial counsel was not deficient for failing to object to these questions to Mayfield, where Michigan case law did not forbid this line of questioning. *See Pursell v. Horn,* 187 F. Supp. 2d 260, 357-358 (W.D. Pa. 2002); *See also Gaither v. Birkett*, 2006 WL 1547636, *4 (E.D. Mich. May 31, 2006)

Petitioner lastly claims that counsel was ineffective for failing to impeach Mayfield and Allen with their prior convictions for providing false information to the police.

The Michigan Court of Appeals rejected this claim, noting that the record established that petitioner's counsel conducted a thorough and extensive cross-examination of each of the witnesses. The Michigan Court of Appeals further noted that some of their testimony was helpful to petitioner's case, including testimony about petitioner's demeanor after the murder. The Michigan Court of Appeals

concluded that petitioner's counsel may have strategically decided not to impeach the witnesses with general information that they were convicted of giving false information to the police and also may have determined that cross-examination on specific discrepancies was more effective. *Nelson,* Slip. Op. at * 7.

"Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

In the present case, petitioner's counsel extensively cross-examined Mayfield.(T. VI, pp. 1001-1037; 1044-45). Counsel obtained an admission from Mayfield that he had been smoking marijuana and drinking alcohol on the day of the shooting and that marijuana usage sometimes affected his memory. Mayfield further admitted to not paying attention most of the time to what was going on at the apartment. In response to counsel's questions, Mayfield indicated that he could not identify who tied the victim up. Mayfield testified that both he and petitioner refused Hardiman's request to help move the victim's body. In response to counsel's question, Mayfield indicated that petitioner did not seem happy when he learned from Hardiman that the victim was dead. Mayfield admitted that he had expressed concern to petitioner that he [Mayfield] might be arrested or held criminally responsible for the victim's death. Mayfield reiterated that petitioner told him that he shot the victim accidentally. Finally, Mayfield admitted that he was in

12

custody for marijuana possession at the time that the police contacted him and although he denied discussing any plea agreement with the authorities, he acknowledged that his marijuana case had been resolved.

Counsel also extensively questioned Allen. (T. VII. pp. 1266-1302; 1312-14). Counsel obtained an admission from Allen that he never saw petitioner hit the victim or put him in a headlock. Allen testified on cross-examination that he had never seen a gun at petitioner's apartment. After being confronted by petitioner's counsel with his prior preliminary examination testimony, Allen acknowledged telling the police that petitioner had been quiet in the car ride after the victim had been shot. Counsel elicited an admission from Allen that he didn't talk to the police until about a year after the murder. Allen acknowledged that he was afraid of Hardiman, not petitioner. In response to counsel's question, Allen indicated that petitioner never asked him to shoot the victim.

In this case, counsel's failure to impeach Mayfield and Allen with their prior convictions for giving false information to a police officer did not undermine confidence in outcome of the case, since a variety of other impeachment evidence was admitted in this case. *See Wolfe v. Bock,* 412 F. Supp. 2d 657, 676-77 (E.D. Mich. 2006). Any failure of counsel to impeach these witnesses with their prior criminal convictions went to their general credibility and involved at most cumulative impeachment evidence, and would thus not support a finding of ineffective assistance of counsel. *See United States v. Pagan*, 829 F. Supp. 88, 92 (S.D.N.Y. 1993).

Petitioner is not entitled to habeas relief, because the Michigan courts' rejection

13

of his ineffective assistance of counsel claims constituted a reasonable application of *Strickland. See Pearl v. Cason,* 219 F. Supp. 2d 820, 829 (E.D. Mich. 2002).

### B. Claim # 4. The systematic exclusion claim.

Petitioner next claims that he was denied his constitutional right to a fair trial drawn from a fair cross-section of the community because of a computer "glitch" in the Kent County Circuit Court juror selection system that omitted for a sixteen month period between April of 2001 and July of 2002 a zip code or codes for an area in Kent County that petitioner claims contained mostly minority group members, instead providing potential jurors from the mostly non-minority suburban areas of Kent County. [2]

Respondent contends that this claim is defaulted, because petitioner only raised this claim for the first time on post-conviction review and failed to establish cause and prejudice for failing to raise his claim on his direct appeal, as required by M.C.R. 6.508(D)(3).

In *Simpson v. Jones*, 238 F. 3d 399, 407-08 (6th Cir. 2000), the Sixth Circuit found the Michigan Supreme Court's reliance on Rule 6.508(D) was sufficient for a federal habeas court to conclude that the decision rested on an adequate and independent state procedural bar. More recently, however, the Sixth Circuit held that a claim is not procedurally defaulted where the Michigan Supreme Court relies upon Rule 6.508(D) without a clear and express invocation of a procedural bar and where the only state court

---

[2] *See* Petitioner's Appendix G.

to provide a reasoned opinion adjudicated the petitioner's claim on the merits. *See Abela v. Martin*, 380 F. 3d 915, 921-24 (6th Cir. 2004). Although the Michigan Court of Appeals and the Michigan Supreme Court rejected petitioner's fair cross-section claim on the basis of Michigan Court Rule 6.508(D), the trial court denied the motion, without mentioning Rule 6.508(D)(3). Thus, it is unclear whether petitioner's claim has been procedurally defaulted.

In any event, this Court notes that procedural default is not a jurisdictional bar to review of a habeas petition the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). In addition, "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir.2003)(citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. Because petitioner's claim lacks merit, it is easier to simply address the merits of petitioner's claim.

Although a defendant has no right to a petit jury composed in whole or in part of persons of his or her own race, he or she does have the right to be tried by a jury whose members are selected by indiscriminatory criteria. *Powers v. Ohio*, 499 U.S. 400, 404 (1991)(internal citations omitted). While states may prescribe relevant qualifications for their jurors, members of a community may not be excluded from jury service on account of their race. *Id.*

A defendant, however, may not challenge the makeup of a jury merely because no members of his or her race are on a jury, but must prove that his or her race has been systematically excluded. *Apodoca v. Oregon*, 406 U.S. 404, 413 (1972); *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 598-99 (E.D. Mich. 2001).  In order to establish a *prima facie* violation of the fair cross-section requirement, a defendant must show:

> (1) that the group alleged to have been excluded is a 'distinctive group' in the community;
> (2) that the representation of that group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process.
> *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

"More than mere numbers must be provided to establish" that members of a particular ethnic or racial group are systematically underrepresented in the jury venire. *United States v. Greene*, 971 F. Supp. 1117, 1128 (E.D. Mich. 1997).  The strength of the evidence of underrepresentation of the group in the venire is only one factor to be considered in determining whether a *prima facie* violation of the fair cross-section requirement has been established.  Factors such as the nature of the process by which jury lists are composed and the length of time of underrepresentation, together with the strength of the evidence that purports to establish unfair and unreasonable representation also need to be examined. *Id.* (*citing to Ford v. Seabold*, 841 F. 2d 677 (6th Cir. 1988)).

Petitioner's claim is without merit.   Petitioner's jury trial took place between October 25, 2000 and November 15, 2000, before the computer glitch that deleted the

zip code area from the Kent County jury pool occured. Petitioner has failed to prove the systematic exclusion of minority jurors, insofar as it was based on the 2001-2002 computer problem, in light of the fact that petitioner's jury was drawn in 2000, before the time that this computer problem occured. *See Crawford v. Vasbinder*, No. 2009 WL 539931, * 13-14 (W.D. Mich. March 3, 2009). Petitioner is not entitled to habeas relief because he has presented no evidence that his jury in 2000 was subject to the errors that occurred with the Kent County jury selection process in 2001 and 2002. *See Davis v. Jones,* No. 2007 WL 2873041, * 7 (W.D. Mich. September 26, 2007). [3] Petitioner is not entitled to habeas relief on his final claim.

## IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims

---

[3] To the extent petitioner may be relying on the Kent County juror selection practices at issue in *Smith v. Berghuis*, 543 F.3d 326 (6th Cir. 2008), his claim is also without merit. The *Smith* case involved systematic practices in existence in Kent County prior to October of 1993. *See Smith*, 543 F.3d at 332. Because those jury selection practices ended long before petitioner's jury was selected in 2000, petitioner cannot rely on the evidence of systematic exclusion presented in *Smith* to prove systematic exclusion in the selection of the jury venire for his trial. *Crawford v. Vasbinder*, 2009 WL 539931, Slip. Op. at * 14.

on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002). A district court therefore has the power to deny a certificate of appealability *sua sponte. See Dell,* 194 F. Supp. 2d at 658.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *Dell,* 194 F. Supp. 2d at 659. The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Id.*

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: April 13, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 13, 2009, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager